**GLAXO WELLCOME, INC., Plaintiff,**

v.

**ANDRX PHARMACEUTICALS, INC., Defendant.**

**No. 99–7179–CIV.**

United States District Court, S.D. Florida.

Feb. 28, 2002.

**1356**

Janet T. Munn, Steel Hector & Davis, Miami, FL, Stephen B. Judlowe, Jason A. Lief, Janet B. Lynn, Hopgood Calimafde Kalil & Judlowe, New York City, Ester H. Steinhauer, O'Donnell Schwartz Glanstein & Rosen, New York City, Philip Hirschhorn, Hopgood Calimafde Judlowe & Mondolino, New York City, for plaintiff.

James Costigan, Alan B. Clement, Hedman Gibson & Costigan, New York City, Eric David Isicoff, James Alan Weinkle, Isicoff Ragatz & Koenigsberg, Miami, FL, for defendant.

## CORRECTED ORDER ON SUMMARY JUDGMENT MOTIONS

FERGUSON, District Judge.

**THIS CAUSE** is before the Court on Plaintiff Glaxo Wellcome's Motion for Partial Summary Judgment as to Claim One [D.E. 130] and Defendant Andrx Pharmaceutical's Motion for Summary Judgment [D.E. 116].

## FACTUAL BACKGROUND

### The Parties and Nature of the Action

Plaintiff Glaxo Wellcome ("Glaxo") is the FDA-approved New Drug Application (NDA) holder and patentee for the sustained release anti-depressant medicine Wellbutrin SR®. Glaxo makes and sells the same medicine under a separate FDA approved NDA, under the name Zyban®, which is used to wean smokers from tobacco. Defendant Andrx Pharmaceuticals ("Andrx") is a manufacturer of generic versions of medicines developed by innovator pharmaceutical product manufacturers. Andrx filed two Abbreviated New Drug Applications (ANDAs), pursuant to 21 U.S.C. § 355(j), with the FDA seeking to sell generic versions of Glaxo's name brand products Wellbutrin (100 mg and 150 mg) and Zyban (150 mg) prior to the expiration of Glaxo's U.S.Patent No. 5,427,798 ("the '798 patent").

On September 15, 1999, Glaxo sued under 35 U.S.C. § 271(e)(2)(A), alleging that Andrx's ANDA products infringe the '798 patent. On September 30, 1999, Andrx answered, denying infringement and counterclaiming for a declaration that (a) Andrx had not infringed the '798 patent, (b) the patents are invalid, and (c) the '798 patent is unenforceable. Glaxo replied to Andrx's counterclaim and later filed a cross-motion for partial summary judgment on infringement of Claim One of the '798 patent.

### The Statutory Structure

Title 35 U.S.C. § 271(e)(2) gives Glaxo the right to an automatic injunction prohibiting Andrx from selling its generic products without having to prove infringement.[1] The statutory section codifies a

---

[1] The statutory right continues even where, as here, the ANDA applicant has been issued a patent on its product. On April 3, 2001 the Examiner in the Patent Trademark Office found that Andrx's release control technology was "distinctly different" from Glaxo's sustained release formulation. The point is discussed in the Prosecution History section of this order.

portion of the Drug Price and Patent Term Restoration Act, 98 Stat. 1585 ("Hatch–Waxman Act"), which sought to facilitate entry of lower priced bioequivalent drugs into the marketplace while also providing incentives for promoting the development of new drug products. In order to accomplish the latter the NDA permits patent holders to list with the FDA patents to which an infringement claim could reasonably be asserted if an unlicensed person engaged in the manufacture, use or sale of the drug product. 21 U.S.C. § 355(b)(1). The FDA is required to publish these patent listings in a publication entitled "*Approved Drug Products With Therapeutic Equivalence Evaluation*," commonly known as "*The Orange Book*." The filing of an ANDA with the FDA by a generic manufacturer, for a product listed in "*The Orange Book*," constitutes a new statutory cause of action for infringement under 35 U.S.C. § 271(e)(2).

An applicant filing an application for a drug product listed in "*The Orange Book*," may make a paragraph IV certification pursuant to the statute if it believes that the ANDA does not infringe the listed patents or that the patent claims are invalid. In addition to making the paragraph IV certification the ANDA applicant must notify the patent owner of the certification. The patent owner may choose to accept the ANDA applicant's certification and not file suit, in which case the FDA may approve the application immediately after completing its ANDA review. If the patent owner sues for infringement within forty-five (45) days of the certification notification, the ANDA statute forbids the FDA from approving the application until there is a final decision of no infringement or invalidity, or thirty (30) months have expired from the date the ANDA was filed,

whichever occurs first, unless a court orders otherwise.

Glaxo filed its complaint within forty-five (45) days of Andrx's certification notice. Accordingly, the FDA was barred from approving Andrx's ANDAs.

**The Subject Drug Compound**

The active drug involved in this case is commonly known as bupropion. Bupropion is a well known drug which itself is no longer the subject of an extant patent, having originally been described in United States Patent No. 3,819,706. Although bupropion has been off-patent for almost ten (10) years Glaxo has continued a monopolization of the market through patents on sustained-released formulations which eliminate the need to take bupropion tablets three or four times a day. Glaxo's '798 patent describes sustained release tablets containing bupropion. Central to this litigation is whether Andrx's ANDA products use a different technology from Glaxo's for controlling drug release.

All of the '798 patent claims require the sustained release bupropion formulation to include hydroxypropyl methylcellulose ("HPMC"). HPMC is an excipient[2] that is available in many different grades ranging from a high viscosity, high molecular weight polymer that forms a release-controlling hydrogel to a low viscosity, low molecular weight HPMC grade commonly known and used in the industry as a main component of instant release film coatings.

In an easily understood presentation of its highly technical infringement claim Glaxo makes an argument which it contends is "limited [to] portions of the claim which are pertinent to the motions at hand." Each of the asserted claims, One, Fourteen, Fifteen, Eighteen and Nineteen,

---

**2.** An excipient is an inert ingredient or substance added to a prescription to give the desired consistency or form.

it alleges, recite the excipient HPMC to the exclusion of others. Glaxo argues that "hydroxypropyl methylcellulose", the specific words at issue used in each of the asserted claims, has a very specific, very precisely defined meaning and because the Andrx product also uses HPMC there is literal infringement. In response Andrx argues that Glaxo's patent '798 makes use or a high density, high molecular weight variety of HPMC to control the release of the active ingredient bupropion. Andrx further asserts that it only uses a low grade of instant release HPMC for a protective coating.

## Claim One

Claim One of patent '798, the only claim subject to Glaxo Wellcome's motion, reads:

[a] controlled sustained release tablet comprising 25 to 500 mg of bupropion hydrochloride and hydroxypropyl methylcellulose [HPMC] to one part of bupropion hydrochloride being 0.19 to 1.1 and said tablet having a surface to volume ration of 3:1 to 25:1 cm$^{-1}$ and said tablet having a shelf life of at least one year at 59˚to 77˚F and 35 to 60% relative humidity, said tablet releasing between about 20 to 60 percent of bupropion hydrochloride in water in 1 hour, between about 50 and 90 percent in 4 hours and not less than about 75 percent in 8 hours.

Glaxo claims that there is no issue of disputed material fact regarding the infringement of Claim One because each of its elements are present in Andrx's proposed 100 mg bupropion hydrochloride product or admitted by Andrx. Glaxo claims that the undisputed presence of each Claim One element in Andrx's product, particularly HPMC, supports a finding of literal infringement and thus, it is entitled to partial summary judgment as to the infringement of Claim One.

## Claims Fourteen and Fifteen

Claims Fourteen and Fifteen outline the plasma level profile of Glaxo's 100 mg and 150 mg versions of controlled-release bupropion hydrochloride products. The plasma level profiles describe the levels of bupropion that are released over time into the bloodstream of live "test patients." Claim Fourteen states:

[a] controlled sustained release tablet comprising an admixture of 100 mg of bupropion hydrochloride and hydroxypropyl methylcellulose [HPMC] which after oral administration of a single one of said tablets in adult men produces plasma levels of bupropion as free base ranging between the minimum and maximum levels as shown in FIG. 5 over twenty four hours.

Claim Fifteen is exactly the same except that it refers to the plasma level profile of the 150 mg version. There is no mention in either of these claims of HPMC being the release-controlling excipient. However, no other excipient is listed.

## Claims Eighteen and Nineteen

Claims Eighteen and Nineteen refer to the dissolution profiles for the 100 mg and 150 mg Glaxo tablets. A dissolution profile differs from a plasma level profile in that a dissolution profile refers to the amount of active ingredient that is dissolved in solution over time, *in vitro*, as opposed to measuring the plasma levels in live patients. A dissolution profile is often used to approximate the patient absorption that is measured in the plasma level profile. Claim Eighteen specifically states:

[a] sustained release tablet containing a mixture of (a) 100 mg of bupropion hydrochloride and (b) a means for releasing between about 25 and 45% of bupropion hydrochloride in one hour, between 60 and 85% in 4 hours and not less than 80 percent in eight hours in

distilled water said means comprising hydroxypropyl methylcellulose [HPMC]. Unlike Claims Fourteen and Fifteen, Claims Eighteen and Nineteen state that HPMC gives Glaxo's patented product its release controlling properties. Similar to Claims Fourteen and Fifteen, Claim Nineteen is identical to Claim Eighteen except that it gives the dissolution profile for the 150 mg product.

In Andrx's summary judgment motion it claims that a finding of non-infringement is proper because the HPMC referenced in Claims One, Fourteen, Fifteen, Eighteen and Nineteen should be interpreted to mean only the high density, high viscosity variety of HPMC. For this reason, Andrx argues that it is entitled to a declaratory judgment of non-infringement because neither their 100 mg or 150 mg products use the high density, high viscosity variety of HPMC.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, a fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505.

In considering this motion for summary judgment, the Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the defendant should prevail as a matter of law." *Id.* at 243, 106 S.Ct. 2505. The movant bears the initial burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether the movant has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-movant. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992). "If reasonable minds could differ on the inferences arising from undisputed facts, summary judgment should be denied." *Id.* at 1534.

Once the initial burden is met, the non-movant must come forward with specific facts showing that there is a genuine issue for trial that precludes summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissable at trial. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991). Likewise, "a mere scintilla of evidence supporting a position will not suffice; there must be enough of a showing that the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Failure to make a showing sufficient to establish the existence of any essential element of a claim is fatal and requires the entry of summary judgment. *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548.

## ISSUES PRESENTED

Two issues raised in this patent action are (1) whether the court may read a limitation into a claim relied on by a drug manufacturer where the product is composed of a common chemical marketed in

different forms with widely varying properties, the claim relies on the term in its broadest form to include grades and properties not used in the product, and a limitation on grade and properties would correspond with the product; and (2) whether it is proper to rely on available extrinsic evidence which gives measurement certainty and technological scope as to the grade and physical properties of the common chemical necessary to operate the invention.

## DISCUSSION

 Claim construction is a two-step approach: (1) interpreting the claim scope as a matter of law, and (2) comparing the properly construed claims to the accused product. *Markman v. Westview Instruments*, 52 F.3d 967, 976 (Fed.Cir.1995).[3] The first step, interpreting the claim scope, is a multi-factor process that includes (1) analyzing the language of the claim, (2) examining the specifications, (3) examining the prosecution history, and (4) considering extrinsic evidence. Claim terms are to be given their plain and ordinary meaning unless the patent specification clearly indicates that the inventor intended a different meaning. *Nat'l Recovery Technologies, Inc. v. Magnetic Separation Sys.*, 166 F.3d 1190, 1195 (Fed.Cir.1999); *Abbey v. Bill Ussery Motors, Inc.* 74 F.Supp.2d 1217, 1218 (S.D.Fla.1999), *aff'd Abbey v. Robert Bosch GMBH*, 217 F.3d 853 '(Fed.Cir.), *cert. denied*, 529 U.S. 1009, 120 S.Ct. 1280, 146 L.Ed.2d 227, *reh'g denied*, 529 U.S. 1095, 120 S.Ct. 1738, 146 L.Ed.2d 656 (2000). "When the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence such as expert testimony for purposes of claim construction." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir.1997). To construe the claim very often is to decide the case. *See Wang Laboratories Inc. v. America Online Inc.*, 197 F.3d 1377, 1381 (Fed.Cir. 1999); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed.Cir.1997).

### A. CLAIM SCOPE

#### (1) Analyzing the Language of the Claims: How the Technology Differs

 Although the claims language in patent '798 fails to specify the type of HPMC to be used, it seems clear that HPMC functions as the release controlling excipient. For example, all of the Claims call for a "sustained release tablet" and HPMC is the only excipient named. Therefore, the claim language itself limits HPMC to the release controlling grade.

Andrx makes use of HPMC but only the non-release controlling low density, low viscosity variety. Some low density HPMC is mixed with bupropion when the "pellets" are sealed, and some low density HPMC is used as a quick-dissolve cover coating. Andrx's patented release-controlling technology depends on diffusion through the Eudragit® and Ethocel® membrane and uses an entirely different technology and chemicals than Glaxo. The HPMC used by Andrx has an instant release E5 grade. Glaxo uses the HPMC grade for sustained release supplied by Dow Chemical Company, Midland, Michigan as Methocel E4M Premium CR.

#### (2) The Patent Specification

The '798 patent makes a number of references to HPMC which dictates that it should be limited to high density, high

---

**3.** The parties agree that the Court may construe the claim on the motions for summary judgment.

viscosity release controlling grades. In Glaxo's *"Brief Statement of the Invention"* the stated purpose of HPMC is "for controlling drug release rate...." Further in Glaxo's *"Detailed Description of the Invention"* it concedes that the limited use of a low density, low viscosity grade of HPMC in the film coating "does not substantially affect the release rate of the bupropion hydrochloride from the tablet, since the coating is instant release which rapidly dissolves in the stomach."

The mention of HPMC in the Claims should be interpreted to refer specifically to the high density, high viscosity variety because of the release-controlling properties of Glaxo's patented tablet. The fact that Glaxo uses a limited amount of low density, low viscosity variety HPMC in its protective coating, but not for release control purposes, is incidental to the patent. In contrast, Andrx makes no use of the high density variety of HPMC in their formulation. Andrx uses HPMC merely as a coating material of the instant release variety. To achieve a release-control profile similar to the one created by using high density HPMC, Andrx relies on a different patented process of sealing separate rate "pellets" with a sustained release coating made from a layered combination of Eudragit® E100 and Ethocel® 100.

■ Even if an accused product seems very similar to a patented product on its face, this does not end the infringement inquiry. If the accused product is so far changed in the principle that it performs the function of the claimed invention in a substantially different way than the patented product, then there is no patent infringement. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1123–24 (Fed.Cir.1985).

**(3) Prosecution History**

■ On April 3, 2001, with this litigation pending, Andrx's patent for the two ANDAs, U.S.Patent No. 6,210,716 B1, was issued over Glaxo's '798 patent which was listed on the application as a prior art reference. The United States Patent Office agreed that the release control technology claimed in Andrx's '716 patent was "distinctly different" from Glaxo's '798 patent. For this same reason, Glaxo's assertion of literal infringement as to Claim One, based on the presence of HPMC in Andrx's products, is diminished in force.

■ If no literal infringement is found, Glaxo alternatively asserts the doctrine of equivalents. In patent infringement law, this doctrine means that if two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same, even though they differ in name, form or shape. *See Warner–Jenkinson Co. v. Hilton Davis Chem., Co.* 520 U.S. 17, 23–25, 117 S.Ct. 1040, 1046–47, 137 L.Ed.2d 146 (1997); *see also* Black's Law Dictionary, 542 (6th ed. 1990). However, prosecution history estoppel bars Glaxo from asserting the doctrine of equivalents.

■ The prosecution history is the public record that notifies the public of what the patent holder is claiming and what the patent holder has given up the right to claim. Prosecution history estoppel prevents the doctrine of equivalents from canceling out the notice function of claims. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558, 564–65 (Fed.Cir.2000), *cert. granted*, 533 U.S. 915, 121 S.Ct. 2519, 150 L.Ed.2d 692 (2001). Sitting *en banc* the *Festo* court held "[w]hen a claim amendment creates prosecution history estoppel with regard to a claim element, there is no range of equivalents available for the amended claim element." *Id.* at 569.

On April 13, 1994 the examiner rejected Claims Fourteen, Fifteen, Eighteen and Nineteen for lack of enablement. Specifically the examiner wrote, "[t]he rate of release is directly related to the release retarding affect of hydroxypropyl methylcellulose. While other excipients have been disclosed, *the particular cellulose is considered critical for controlled and/or sustained release and should be incorporated into the independent claims.* The disclosure of a single species does not provide a basis for disclosing a generic concept...." (emphasis added). In response, Glaxo amended Claims Fourteen and Fifteen to recite that the tablets required HPMC. Glaxo failed to amend Claims Eighteen and Nineteen at that time. These claims were later amended by the Examiner to identify the use of HPMC as the means for releasing bupropion.

Glaxo's Claim One as originally filed also did not contain any recitations regarding bupropion release. The examiner, rejecting this Claim for lack of enablement as well, noted, "[a]pplicants are claiming a tablet that provides a *distinct release profile.* The advantage provided by the unique tablet *differ [sic] from the instant release tablet. The limitations of claims 2–3 are considered critical and should be incorporated into claim 1 for proper enablement.*" (emphasis added). In response Glaxo amended Claim One with release controlling language. Thus by amending these Claims, Glaxo conceded that HPMC was the "particular cellulose that is critical for the controlled release of the tablets". Because Glaxo was forced to amend its Claims to include the release profile, which was deemed to be an integral part of the patented product, and conceded that a particular cellulose is critical to sustained release, it cannot now assert that its patent also covers low density, low viscosity HPMC. The examiner opined that the release controlling language in Claims One, Fourteen, Fifteen, Eighteen and Nineteen

was too broad. Glaxo's subsequent amendment of the Claims, however, still fails to expressly indicate which of the wide grades of HPMC it intends to use without one drawing inferences based largely on the end result—the manner in which the patented product functions.

Glaxo asserts, nevertheless, that this Court should not "read into the claim a property, modifier or the like which, in fact, is not in the claim," arguing that "it is improper to import the limitation from the written description into the claim" where *"the claim language is clear on its face"* (emphasis added). Reliance is placed on the general proscription against reading limitations into claims with citations to a plethora of cases. *See e.g. Rodime PLC v. Seagate Tech. Inc.,* 174 F.3d 1294, 1303 (Fed.Cir.1999) (court refused to read in a requirement for a "thermal compensation device" into a claim for a computer hard-disk transducer positioning device); *E.I. du Pont de Nemours & Co. v. Phillips,* 849 F.2d 1430, 1432–33, 1438, 1441 (Fed.Cir. 1988) (court refused to read in limitations that copolymer "possess[es] (1) superior environmental stress crack resistance and (2) impact strength"); *Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 865–66 (Fed.Cir.1997) (court refused to read the word "linear" into reciprocating slide plate claim); *Transmatic Inc. v. Gulton Indus. Inc.,* 53 F.3d 1270, 1278 (Fed. Cir.1995) (court refused to read "attachment means" or "air flow characteristics" into claim on bus cornice lighting fixture); *Rawlplug Co. v. Illinois Tool Works Inc.,* 11 F.3d 1036, 1044 (Fed.Cir.1993) (court refused to read "linear offset" limitation into claim on masonry anchor shank). But there are recognized exceptions to the rule.

Reading a limitation into a claim is appropriate "where the claim term would render the claim devoid of clarity

such that there is no means by which the scope of the claim may be ascertained from the language used." *Tate Access Floors, Inc., et al., v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 2002 U.S.App. LEXIS 1924 (Fed.Cir.2002). *Tate* affirmed the use of a limitation when construing the claim for the reason that one ordinarily skilled in the art would find the limitation necessary and the description plainly contemplated the limitation. *See also Abbott Laboratories v. Torpharm, Inc.*, 156 F.Supp.2d 738 (N.D.Ill.2001) (patent claim terms may be narrowed by references to written descriptions and prosecution history where the language of the claims invites reference to those sources). All grades of HPMC could no longer be read into the Glaxo claims to a certainty after the amendment which recognized that a particular grade was critical for controlled or sustained release, therefore an invitation was extended to refer elsewhere for particular grade information.

If the Claims in this case are now construed to include both types and all uses of HPMC, both the Claim language and patent specifications would be impermissibly broadened. Glaxo has not established a case for literal infringement of Claim One because it has not proven by a preponderance of the evidence that the accused product includes elements that are literally identical to each and every limitation of the properly construed patent claim. *See Biovail Corp. Int'l. v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1302 (Fed.Cir.2001); *Abbey*, 74 F.Supp.2d at 1221.

■ Assuming that ambiguity is present in the claim language this Court may consider not only intrinsic evidence, such as the specification and file history, but also extrinsic evidence, including expert and inventor testimony, prior art, publications, dictionaries and treatises, where necessary. *See Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370,

1372 (Fed.Cir.2000) (claim terms are to be given their plain, dictionary meaning unless the patent specification expresses a clear intention to the contrary); *see also Tanabe Seiyaku Co. v. United States Int'l. Tr. Comm'n.*, 109 F.3d 726 (Fed.Cir.1997); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). However, expert testimony cannot contradict the interpretation of the claims based on the intrinsic evidence. *Aqua–Aerobic Sys., Inc. v. Aerators Inc.*, 211 F.3d 1241, 1245 (Fed.Cir.2000); *Altek Sys.*, 132 F.3d at 706.

**(4) Extrinsic Evidence**

The extrinsic evidence further supports the conclusion that the term HPMC is properly construed solely as release controlling grades of HPMC (i.e. high density, high molecular weight). At their deposition the two (2) '798 patent inventors, who were designated as Glaxo's 30(b)(6) representatives on the HPMC/bupropion ratio, included only the release controlling HPMC in their calculations and excluded the low grade HPMC used in the coating. Glaxo admits that it did not include the amount of low density HPMC in Glaxo's calculation of the Claim One, element # 4 ratio. However, Glaxo's scientists did include the low density HPMC covering of Andrx's product in concluding that it was within the range specified by element # 4. If this covering were omitted from the Andrx product calculations, the way it is for Glaxo's patented product, the ratio in Andrx's product would no longer fall within the patented range. Glaxo may not benefit from this discrepancy in calculating the amounts of all HPMC varieties against Andrx.

Dr. Banakar, a drug formulation expert, opined that a formulator of ordinary skill in the art would interpret the claim term HPMC as only including high molecular

weight, high viscosity release controlling grades. Further, Dr. Banakar verified, with uncontroverted experiment evidence, that the '798 patent is only enabled by release controlling HPMC grades and that the instant release HPMC used in Andrx's products does not control bupropion release.

Further publications such as Dow Chemical Company's technical literature distinguishes the HPMC grades used in Glaxo and Andrx's patents. The grade used in Glaxo's patent is described as a controlled release grade while the HPMC used by Andrx is described as an instant release grade.

## B. COMPARING THE PROPERLY CONSTRUED CLAIMS TO THE ACCUSED PRODUCT

Arguing, by analogy, for a broad construction of the term HPMC, Glaxo posits "milk" as an example of a term with clear meaning which needs no modifiers such as "whole" or "skim" in order to protect against infringement. The analogy better illustrates the weakness in Glaxo's main argument. Milk has several sources such as (1) human, (2) cattle, (3) buffalo, (4) camel, (5) goat, (6) yak, (7) reindeer, (8) sheep and (9) soy plants. The American Heritage Dictionary 796 (2d ed.1985). Each of these forms of milk have different composites such as varying ratios of solids to water. In processing it may be fortified with nutrients or made into acidophilus milk for treating intestinal disorders. The modifiers describing the source and formulation process serve important notice as to composition and circumstances where use of a certain type may be contraindicated. The same may be said of another common chemical, paint, which is generally considered a coloring agent. Paints have different pigments and vehicles which are functional as well as aesthetic. The kinds of paints most commonly used include (1) oil-based, (2) latex, (3) lacquers, (4) fire-retardant, (5) heat-resistant, (6) cement water, (7) wood and plaster primers, and (9) enamels. The World Book Encyclopedia, Vol 16, p. 20 (1983). The type of paint used, as identified by descriptive modifiers, may be critical to its purpose.

Internal tension is found further in Glaxo's contentions, reflecting the above observation on functionality, that HPMC, like most chemicals and elements, is subject to many descriptive terms regarding quality, quantity and grade; may come in different packaging weights, trade designations and purities; and may be specific as an illustrative embodiment of the patent. Nevertheless Glaxo concludes that because no specific grade, style or physical property was added to the Claims there are no limitations to the HPMC recitation.

There are practical and scientific reasons for rejecting Glaxo's reasoning as observed by the patent examiner. Further it is arguable, at least to the point of creating ambiguity, that Glaxo did indeed limit its HPMC use to that with a specific property, or physical parameter such as to correspond with the invention to the exclusion of other grades which do not function in the product to produce a sustained release.

## CONCLUSION

■ The Claims' language, patent specification, prosecution history, and extrinsic evidence effectively negate Glaxo's assertion that the term HPMC includes all grades. Glaxo's view that the scope of its original '798 patent encompasses all HPMC varieties is overly broad. The proper scope of the claim limits the term HPMC to the high density, high viscosity variety with release-controlling properties because the '798 patent does not enable one skilled in the art to use the claimed invention with low-viscosity, low molecular weight instant release HPMC grades. In fact, controlled release can be attained in

the Glaxo product only by using a high molecular weight, high-viscosity release controlling HPMC grade.

Although Andrx proffers additional evidence that Claims Fourteen and Fifteen[4] and Eighteen and Nineteen[5] differ from Glaxo's patent '798 because the products contain different plasma and dissolution profiles, these arguments need not be addressed pursuant to this Court's finding that the recited HPMC in those Claims should be interpreted to mean only the high density, high viscosity variety not used in Andrx's products.

Andrx succeeded in its effort to design around the '798 patent. As previously described, Andrx's products use an entirely different technology than Glaxo's for controlling bupropion release. Glaxo's '798 patent explains its sustained release tablets as blending bupropion with HPMC along with other excipients. The blended materials are then compressed into a tablet. Andrx's products do not form a hydrogel in the same manner as the high-viscosity, high molecular weight HPMC described in the '798 patent. Instead, the Andrx products are formed by the compression of two different but related types of controlled release pellets. The mixture of these two pellets forms a polymeric membrane that regulates the amount of drug that is allowed to diffuse through the membrane. The bupropion sustained release technology used in Andrx's products was deemed to be "distinctly different" from Glaxo's '798 patent by award of United States Patent No. 6,210,716 B1. This Court agrees that both the Glaxo and Andrx patents are valid and that Andrx has not infringed upon Glaxo's '798 patent.

After reviewing the motions, responses and pertinent portions of the record, and having heard oral arguments, it is hereby

**ORDERED AND ADJUDGED** that the Plaintiff Glaxo Wellcome's Motion for Partial Summary Judgment as to Claim One [D.E. 130] is **DENIED.** Defendant Andrx Pharmaceutical's Motion for Summary Judgment of Non–Infringement [D.E. 116] is **GRANTED.** Jurisdiction is retained to determine interest, costs and attorney's fees. All pending motions are hereby **dismissed as moot.**

---

4. As to Claims Fourteen and Fifteen Andrx argues that its products' plasma profiles do not fall within Glaxo's minimum and maximum curves. Glaxo created the minimum and maximum curves by taking the highest and lowest plasma levels at each point in time from among all test subjects rather than minimum and maximum curves representing data from the same patient or patients (a "maximum patient" and a "minimum patient"). Andrx claims that the use of "mixed curves" are highly unconventional, but since Glaxo used mixed curves in the patent claim Andrx should be entitled to use "mixed curves" to show their non-infringement.

Originally Glaxo's Claims Fourteen and Fifteen said bupropion levels should range "substantially" between the minimum and maximum curves in Fig. 5 & Fig. 6. Glaxo subsequently removed the term "substantially" because the patent examiner found it was too indefinite. Because Glaxo had to narrow Claims Fourteen and Fifteen for patentability reasons, Andrx argues that prosecution history estoppel bars application of the doctrine of equivalents.

5. Andrx asserts that neither its 100 mg or 150 mg products exhibit a dissolution profile completely within the range of Glaxo's dissolution profile, based on the testimony of Andrx's expert, Dr. Banakar. Again, the issue raised by these contentions need not be addressed.